1
2
3
4
5
6
7

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

8
9

**UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17
18
19

JACOB GUZ, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

SILVERGATE CAPITAL
CORPORATION, ALAN J. LANE,
and ANTONIO MARTINO

Defendants.

Case No. **'22CV1968 AJB BGS**

<u>CLASS ACTION</u>

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

**<u>DEMAND FOR JURY TRIAL</u>**

20
21
22
23
24
25
26
27
28

Plaintiff Jacob Guz ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Silvergate; and (c) review of other publicly available information concerning Silvergate.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Silvergate is a digital currency company. Its platform, the Silvergate Exchange Network ("SEN"), provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors. Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

3.     On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."

1

4.     On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

5.     On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposure to recently collapsed cryptocurrency exchange FTX, including Silvergate.  The article highlighted the connection linking Silvergate to a money laundering operation that transferred $425 million off cryptocurrency trading platforms.

6.     On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

7.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm; and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**JURISDICTION AND VENUE**

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this

11.   Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

## PARTIES

12.   Plaintiff Jacob Guz, as set forth in the accompanying certification, incorporated by reference herein, purchased Silvergate securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.   Defendant Silvergate is incorporated under the laws of Maryland with its principal executive offices located in La Jolla, California.  Silvergate's Class A common stock trade on the New York Stock Exchange ("NYSE") under the symbol "SI," and its depository shares, each representing a 1/40th interest in a share of 5.375% fixed rate non-cumulative perpetual preferred stock, Series A trade under the symbol "SI PRA."

14.   Defendant Alan J. Lane ("Lane") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15.   Defendant Antonio Martino ("Martino") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16.     Defendants Lane and Martino (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

17.     Silvergate is a digital currency company.  Its platform, the SEN, provides payments, lending, and funding solutions for an expanding class of digital currency companies and investors.  Silvergate is also the parent company of Silvergate Bank which provides financial services that include commercial banking, commercial and residential real estate lending, mortgage warehouse lending, and commercial business lending.

**Materially False and Misleading Statements Issued During the Class Period**

18.   The Class Period begins on November 9, 2021.[1]  On that day, the Company filed its quarterly report on Form 10-Q for the period ended September

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

4

30, 2021, stating that "the Company's disclosure controls and procedures were effective as of September 30, 2021."

19. On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K touted the platform's compliance with regulatory requirements, stating "[a]s of December 31, 2021, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes *extensive regulatory compliance diligence*." The 2021 10-K reiterated that "[o]ur solutions and services are built on our deep-rooted commitment and proprietary approach to regulatory compliance," and that the Company has developed compliance capabilities, which "include *ongoing monitoring of customer activities* and evaluating a market participant's ability to actively monitor the flow of funds of their own customers."

20. The 2021 10-K also stated that the Company has policies to comply with applicable regulations regarding money laundering:

> ***Anti-Terrorism, Money Laundering Legislation and OFAC***
>
> \*     \*     \*
>
> ***The Bank has established appropriate anti-money laundering and customer identification programs.*** The Bank also maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act. The Bank otherwise has implemented policies and procedures to comply with the foregoing requirements.
>
> \*     \*     \*
>
> ***The Bank has implemented policies and procedures to comply with the foregoing requirements.***

21. The 2021 10-K contained the following risk related to the Digital Currency Industry, the ability to use digital currency to engage in illegal

5

transactions, and how the Company's risk management and compliance framework are meant to combat this risk:

> ***The characteristics of digital currency have been, and may in the future continue to be, exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and ransomware scams; if any of our customers do so or are alleged to have done so, it could adversely affect us.***

Digital currencies and the digital currency industry are relatively new and, in many cases, lightly regulated or largely unregulated. Some types of digital currency have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain digital currency transactions and encryption technology that anonymizes these transactions, that make digital currency particularly susceptible to use in illegal activity such as fraud, money laundering, tax evasion and ransomware scams. Two prominent examples of marketplaces that accepted digital currency payments for illegal activities include Silk Road, an online marketplace on the dark web that, among other things, facilitated the sale of illegal drugs and forged legal documents using digital currencies and AlphaBay, another darknet market that utilized digital currencies to hide the locations of its servers and identities of its users. Both of these marketplaces were investigated and closed by U.S. law enforcement authorities. U.S. regulators, including the SEC, Commodity Futures Trading Commission (the "CFTC"), and Federal Trade Commission (the "FTC"), as well as non-U.S. regulators, have taken legal action against persons alleged to be engaged in Ponzi schemes and other fraudulent schemes involving digital currencies. In addition, the Federal Bureau of Investigation has noted the increasing use of digital currency in various ransomware scams.

> ***While we believe that our risk management and compliance framework, which includes thorough reviews we conduct as part of our due diligence process (either in connection with onboarding new customers or monitoring existing customers), is reasonably designed to detect any such illicit activities*** conducted by our potential or existing customers (or, in the case of digital currency exchanges, their customers), we cannot ensure that we will be able to detect any such

illegal activity in all instances. Because the speed, irreversibility and anonymity of certain digital currency transactions make them more difficult to track, fraudulent transactions may be more likely to occur. We or our banking counterparties may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. If one of our customers (or in the case of digital currency exchanges, their customers) were to engage in or be accused of engaging in illegal activities using digital currency, we could be subject to various fines and sanctions, including limitations on our activities, which could also cause reputational damage and adversely affect our business, financial condition and results of operations.

(First emphasis in original.)

22.   The 2021 10-K also contained the following risk factor purporting to warn that the Company would be at risk of enforcement actions if Silvergate failed to institute proper anti-money laundering programs:

> ***Financial institutions, such as the Bank, face risks of noncompliance and enforcement actions related to the Bank Secrecy Act and other anti-money laundering statutes and regulations (in particular, as such statutes and regulations relate to the digital currency industry).***
>
> The Bank Secrecy Act, USA Patriot Act, FinCEN and other laws and regulations ***require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate.*** To administer the Bank Secrecy Act, FinCEN is authorized to impose significant civil money penalties for violations of those requirements and has recently engaged in coordinated enforcement efforts with the individual federal banking regulators, as well as the U.S. Department of Justice, Drug Enforcement Administration and the IRS. There is also increased scrutiny of compliance with the sanctions programs and rules administered and enforced by the Treasury Department's Office of Foreign Assets Control.
>
> Our compliance with the anti-money laundering laws is in part dependent on our ability to adequately screen and monitor our customers for their compliance with these laws. Customers associated

with our digital currency initiative may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies. ***We have developed enhanced procedures to screen and monitor these customers, which include, but are not limited to, system monitoring rules tailored to digital currency activities, a system of "red flags" specific to various customer types and activities, the development of and investment in proprietary technology tools to supplement our third-party transaction monitoring system, customer risk scoring with risk factors specific to the digital-currency industry, and the use of various blockchain monitoring tools. We believe these enhanced procedures adequately screen and monitor our customers associated with the digital currency initiative for their compliance with anti-money laundering laws;*** however, given the rapid developments in digital currency markets and technologies, there can be no assurance that these enhanced procedures will be adequate to detect or prevent money laundering activity. If regulators determine that our enhanced procedures are insufficient to address the financial crimes risks posed by digital currencies, the digital currency initiative may be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

***To comply with regulations, guidelines and examination procedures in this area, we have dedicated significant resources to our anti-money laundering program.*** If our policies, procedures and systems are deemed deficient, we could be subject to liability, including fines and regulatory actions such as restrictions on our ability to pay dividends and the inability to obtain regulatory approvals to proceed with certain aspects of our business plans, including acquisitions and de novo branching.

23.    The 2021 10-K stated that management determined that "as of December 31, 2021, the Company maintained effective internal control over financial reporting . . . ."

24.    On May 9, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.  The 1Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's

compliance with regulatory requirements, stating "[a]s of March 31, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes ***extensive regulatory compliance diligence***."

25.   The 1Q22 10-Q stated that there were no changes to the Company's internal control over financial reporting and affirmed that "the Company's disclosure controls and procedures were effective as of March 31, 2022."

26.   On August 8, 2022, the Company filed its Form 10-Q with the SEC for the period ended June 30, 2022 (the "2Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.

27.   The 2Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of June 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

28.   The 2Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of June 30, 2022."

29.   On November 1, 2022, Silvergate held an investor presentation, which was filed as Exhibit 99.1 to a Form 8-K filed with the SEC the same day.  It stated the following about compliance and risk management.

1



30.   On November 7, 2022, Silvergate filed its Form 10-Q with the SEC for the period ended September 30, 2022 (the "3Q22 10-Q"), incorporating by reference the previously discussed risks discussed in the 2021 10-K.  The 3Q22 10-Q also reaffirmed statements from the 2021 10-K touting the Company's platform's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

31.   The 3Q22 10-Q reaffirmed that there were no changes to the Company's internal control over financial reporting and that "the Company's disclosure controls and procedures were effective as of September 30, 2022."

32.   On November 16, 2022, Silvergate issued a press release providing, among other things, a mid-quarter update.  The press release stated:

> "Silvergate's platform, including our risk management and compliance infrastructure, was built to support our clients during times of market volatility and transformation," said Alan Lane, CEO of Silvergate.

33.   The above statements identified in ¶¶ 18-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed

to disclose to investors: (1) that the Company's platform lacked sufficient controls and procedures to detect instances of money laundering; (2) that Silvergate's customers had engaged in money laundering in amounts exceeding $425 million; (3) that, as a result of the foregoing, the Company was reasonably likely to receive regulatory scrutiny and face damages, including penalties and reputational harm and (4) that, as a result of the foregoing, Defendant's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

34.   On November 15, 2022, Marcus Aurelius Research tweeted that "Recently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers. Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers." The tweet contained a link to an August 2022 forfeiture application for probable cause filed in Broward County, Florida.   The forfeiture application connected Silvergate to a money laundering operation and stated, in relevant part:

In June 2022, *your Affiant subpoenaed bank account records for multiple digital cryptocurrency trading platforms held at Silvergate Bank*. The records for those accounts held in the name of OSL Digital LTD, OSL SG PTE LTD, Paxos Global PTE LTD, and Paxos Trust Company LLC. In these records were the wire transfer payment details from the various operating accounts which represented the funds being transferred off the respective cryptocurrency platforms and into the US financial system.

Your Affiant examined the records produced by Silvergate Bank found the following:

(i)   *During the period of September 2021 to June 2022 ten companies had transferred a total of over $425 million dollars off these cryptocurrency trading platforms into accounts held at different US banks.*

(ii)   The accounts of these ten companies were receiving funds in the same pattern as those previously identified and seized (discussed above) by the MLTF for being used to facilitate the laundering of illicit funds

(iii)   In addition to the transaction pattern of these ten companies being consistent with those previously identified as being used to facilitate money laundering, your Affiant noted that the transaction patterns of these ten companies were not consistent with the transaction patterns of thousands of other persons and businesses using the same digital cryptocurrency trading platforms contained in the same records

35.   On this news, the Company's Class A common stock price fell $6.13, or 17%, to close at $29.36 per share on November 15, 2022, on unusually heavy trading volume.

36.   On November 17, 2022, The Bear Cave newsletter released an article about several companies with potential exposures to recently collapsed cryptocurrency exchange FTX, including Silvergate.  In addition to the money laundering operation linked to Silvergate that transferred $425 million off cryptocurrency trading platforms, it drew attention to potential violations of Silvergate's anti-nepotism policy:

In February 2022, Silvergate, which has ~$13 billion in deposits, boasted that its exchange network "recently crossed $1 trillion in cumulative payment volumes [and] is integral to the everyday operations of our digital currency customers."

Last week, Silvergate replaced its Chief Risk Officer with its Chief Operating Officer. The former Chief Risk Officer was Tyler Pearson. Mr. Pearson is the son-in-law of Silvergate's CEO Alan Lane. Silvergate's Bank Manager of Correspondent Banking is Jason Brenier. Mr. Brenier is also the son-in-law of Silvergate's CEO Alan Lane. And Silvergate's Chief Technology Officer, Chris Lane, is the son of Alan Lane. In its most recent proxy filing, Silvergate said the employments were in compliance with its "Anti-Nepotism Policy."

37.   On this news, the Company's Class A common stock price fell $3.00, or 10.7%, to close at $24.90 per share on November 18, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

38.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Silvergate securities between November 9, 2021 and November 17, 2022, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Silvergate's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Silvergate shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Silvergate or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Silvergate; and

c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

43.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

43.   The market for Silvergate's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Silvergate's securities relying upon the integrity of the market price of the Company's securities and market information relating to Silvergate, and have been damaged thereby.

44.  During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Silvergate's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Silvergate's business, operations, and prospects as alleged herein.

45.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

46.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.  During the Class Period, Plaintiff and the Class purchased Silvergate's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations

made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

48.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

49.   The market for Silvergate's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Silvergate's securities traded at artificially inflated prices during the Class Period.   On November 19, 2021, the Company's share price closed at a Class Period high of $219.75 per share.   Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Silvergate's securities and market information relating to Silvergate, and have been damaged thereby.

50. During the Class Period, the artificial inflation of Silvergate's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Silvergate's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Silvergate and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

51. At all relevant times, the market for Silvergate's securities was an efficient market for the following reasons, among others:

   a)   Silvergate shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

   b)   As a regulated issuer, Silvergate filed periodic public reports with the SEC and/or the NYSE;

   c)   Silvergate regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

   d)   Silvergate was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

52.   As a result of the foregoing, the market for Silvergate's securities promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in Silvergate's share price. Under these circumstances, all purchasers of Silvergate's securities during the Class Period suffered similar injury through their purchase of Silvergate's securities at artificially inflated prices and a presumption of reliance applies.

53.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

54.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-

looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Silvergate who knew that the statement was false when made.

## **FIRST CLAIM**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

55.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Silvergate's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

57.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Silvergate's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Silvergate's financial well-being and prospects, as specified herein.

59.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Silvergate's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Silvergate and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

60.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all

relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

61. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Silvergate's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Silvergate's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Silvergate's securities during the Class Period at artificially high prices and were damaged thereby.

63.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Silvergate was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Silvergate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

66.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.   Individual Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual

1    Defendants were provided with or had unlimited access to copies of the

2    Company's reports, press releases, public filings, and other statements alleged by

3    Plaintiff to be misleading prior to and/or shortly after these statements were issued

4    and had the ability to prevent the issuance of the statements or cause the

5    statements to be corrected.

6         68.   In particular, Individual Defendants had direct and supervisory

7    involvement in the day-to-day operations of the Company and, therefore, had the

8    power to control or influence the particular transactions giving rise to the

9    securities violations as alleged herein, and exercised the same.

10        69.   As set forth above, Silvergate and Individual Defendants each violated

11    Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

12    Complaint.   By virtue of their position as controlling persons, Individual

13    Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

14    and proximate result of Defendants' wrongful conduct, Plaintiff and other

15    members of the Class suffered damages in connection with their purchases of the

16    Company's securities during the Class Period.

17                     **PRAYER FOR RELIEF**

18    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

19        A.   Determining that this action is a proper class action under Rule 23 of

20    the Federal Rules of Civil Procedure;

21        B.   Awarding compensatory damages in favor of Plaintiff and the other

22    Class members against all defendants, jointly and severally, for all damages

23    sustained as a result of Defendants' wrongdoing, in an amount to be proven at

24    trial, including interest thereon;

25        C.   Awarding Plaintiff and the Class their reasonable costs and expenses

26    incurred in this action, including counsel fees and expert fees; and

27        D.   Such other and further relief as the Court may deem just and proper.

28

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2022

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

GROSSMAN LLP
Stanley M. Grossman
(*pro hac vice* application forthcoming)
Judd B. Grossman
(*pro hac vice* application forthcoming)
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (646) 770-7445
Facsimile: (646) 417-7997
sgrossman@grossmanllp.com
jgrossman@grossmanllp.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.       I, Jacob Guz, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.       I have reviewed a Complaint against Silvergate Capital Corporation ("Silvergate") and authorize the filing of a comparable complaint on my behalf.

3.       I did not purchase or acquire Silvergate securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.       I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Silvergate securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.       The attached sheet lists all of my transactions in Silvergate securities during the Class Period as specified in the Complaint.

6.       During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.       I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed** ___12/17/2022___
               (**Date**)


_____
(**Signature**)

JACOB GUZ

(**Type or Print Name**)

**Silvergate Capital Corporation (SI)**                                                                 **Jacob Guz**

**List of Purchases and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 5/9/2022 | 200 | $92.7500 |
| Purchase | Common Stock | 5/10/2022 | 200 | $85.7500 |
| Purchase | Common Stock | 5/11/2022 | 200 | $77.0000 |
| Purchase | Common Stock | 5/12/2022 | 200 | $60.0000 |
| Purchase | Common Stock | 5/16/2022 | 200 | $70.0000 |
| Purchase | Common Stock | 7/22/2022 | 100 | $86.7500 |
| Purchase | Common Stock | 8/9/2022 | 1,000 | $99.6500 |
| Purchase | Common Stock | 8/17/2022 | 1,000 | $99.0000 |
| Purchase | Common Stock | 10/21/2022 | 1,000 | $52.3000 |
| Purchase | Common Stock | 11/7/2022 | 1,000 | $51.0000 |
| Sale | Common Stock | 7/18/2022 | (1,000) | $70.2500 |
| Sale | Common Stock | 7/28/2022 | (1,000) | $91.2500 |
| Sale | Common Stock | 8/10/2022 | (100) | $104.0000 |
| Sale | Common Stock | 10/21/2022 | (1,000) | $54.0000 |
| Purchase | C 20220916 85 | 9/1/2022 | 10 | $5.5000 |
| Sale | C 20220916 85 | 9/2/2022 | (10) | $8.2000 |